**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| RONALD W. HODGES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-cv-1675 (TSC) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Ronald Hodges was employed by the District of Columbia's Office of the Inspector General ("OIG") until his termination in September 2010. In this action, he brings claims against the District for disability discrimination and failure to accommodate under the D.C. Human Rights Act, as amended, D.C. Code § 2-1401 *et seq.* (the "DCHRA"), and the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* (the "ADA"). He also alleges violation of the Family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (the "FMLA").

Before the court are the District's Motion for Summary Judgment on all of Plaintiff's claims and Plaintiff's Motion for Summary Judgment on his FMLA claim.

Upon consideration of the parties' pleadings, and for the reasons set forth below, the District's Motion is hereby **GRANTED IN PART and DENIED IN PART**, and Plaintiff's Motion is hereby **DENIED**.

## I.     BACKGROUND

In 2010, while he was employed by OIG, Plaintiff began experiencing back pain. He was first treated by Dr. Charles Azzam, who referred him for a June 8, 2010 MRI examination that revealed a disc herniation, disc oseophyte complex and disc bulge. (*See* Pl.'s

Mot. Ex. 2 at 2).  After Dr. Azzam's treatment proved unsuccessful, Plaintiff sought treatment

with another physician, Dr. Peter Huynh.  (*See* Pl.'s Mot. Ex. 1 ¶¶ 3-4).

The last day Plaintiff reported to work at OIG was July 21, 2010.  (Pl.'s Opp'n at 2).  On

July 22, 2010, Dr. Huynh signed a work restriction form stating that Plaintiff would be "totally

disabled" for five days, through July 27, 2010.  (Pl.'s Mot. Ex. 3 at 1).  The work restriction form

also stated that Plaintiff could return to "normal duty" on July 28, 2010, with work restrictions to

include stooping, bending, climbing, kneeling and squatting.  (*Id.*).[1]

Plaintiff did not return to work on July 28, 2010, however.  Instead, on July 29, 2010,

Dr. Huynh completed a medical certification for Plaintiff.  (*See* Pl.'s Mot. Ex. 4).  The

certification[2] stated that:

- Plaintiff had a "**serious health condition**" requiring "continuing treatment."
  (*Id.* at 1, 4).

- Plaintiff's "**serious health condition**" commenced in June 2010 and was
  expected to last for three to six months.  (*Id.* at 1).

- Plaintiff would be required "to take work only **intermittently or to work on
  a less than full schedule**" for approximately three months "because of
  **treatment** on an **intermittent** or **part-time** basis."  (*Id.* at 1-2).

- Plaintiff would need to receive treatment three times per week for four to six
  weeks, and one to two times per week for one month thereafter.  (*Id.* at 2).

- It would be "necessary" for Plaintiff "to be **absent from work for treatment**
  . . . due to the distance to [the] clinic" where he would be receiving such
  treatment.  (*Id.*).

---

[1] Despite the fact that Plaintiff did not report to work during the five-day period covered by the
work restriction form, he did not provide the form to OIG until more than a week after that
five-day period had ended.  (*See* Def.'s Statement of Facts Not in Dispute ¶ 11) ("Sometime after
August 6, 2010, Plaintiff provided a doctor's note requesting that Plaintiff be excused from work
until July 28, 2010 and indicating that Plaintiff could return to full duty thereafter.").

[2] All emphasized language in original.

Under a heading relating to the kinds of work that Plaintiff would be "**unable to perform**,"
Dr. Huynh listed "no prolonged sitting" and "no heavy lifting" over five pounds.  (*Id.*)  Under a
heading relating to "**the essential functions of [Plaintiff's] job**" that he would be "**unable to
perform**," Dr. Huynh did not list anything.  (*Id.*).

On July 30, 2010, the day after Dr. Huynh completed the certification, Plaintiff contacted
LaDonia Wilkins, OIG's Deputy Assistant Inspector General for Audits, and informed her that
he was "under [a] doctor's care, preventing [him] from returning to work," and that he "would be
unable to report to work for another 4 to 6 weeks."  (Pl.'s Mot. Ex. 5 at 1).  Plaintiff does not
appear to have contacted OIG prior to July 30, 2010 to explain why he had not appeared for
work since July 21, 2010.

On August 6, 2010, Ronald King, OIG's Assistant Inspector General for Audits, sent
Plaintiff a letter regarding Plaintiff's July 30, 2010 conversation with Wilkins.  (*See* Pl.'s Mot.
Ex. 5).  The letter directed Plaintiff to contact King by August 11, 2010 "to apprise [him] as to
what leave category [Plaintiff's] absences should be charged to," and informed Plaintiff that if he
failed to do so, he would be considered absent without leave ("AWOL").  (*Id.* at 1).  The letter
also directed Plaintiff to have an enclosed medical certification form completed by his health
care provider and returned to King within five business days.  (*See id.*).

Plaintiff did not get Dr. Huynh to complete this new medical certification form and
instead provided King with the July 29, 2010 certification on August 13, 2010.  (*See* Pl.'s Mot.
Ex. 6 at 1).

On August 16, 2010, King sent Plaintiff a letter that stated:

I have reviewed the Certification and note that your chiropractor, Peter Huynh,
indicates that your current medical condition requires:

- three (3) treatments per week for 4-6 weeks, 1-2 treatments
  per week for 1 month;

- no prolonged sitting; and
- no heavy lifting (over 5 lbs.).

Further, the Certification states that you need to be absent from work for treatment "due to the distance to clinic" (Springfield, VA).

Based on the Certification, I have denied your request for leave without pay for an indefinite period.  However, the OIG will provide accommodations pursuant to the parameters listed in the Certification:

- you should stand up, stretch, and walk around to avoid prolonged sitting; and
- you are not required to lift items greater than five (5) pounds.

In addition, in accordance with District regulations, your treatment and related commute can be charged to eligible annual leave, sick leave, or leave without pay.

(*Id.*).  The August 13 letter further stated that King expected Plaintiff "to report to work immediately," and that he would be considered AWOL if he did not.  (*Id.* at 2).

Plaintiff did not respond to the August 13 letter, and did not return to work.  On August 16, 2010, King completed a Notification of Charge to Absence Without Leave form which stated that Plaintiff had failed to report to work that day despite the fact that the certification indicated that he was able to work.  (*See* Def.'s Mot. Ex. G at 3).

On August 25, 2010, Inspector General Charles Willoughby sent Plaintiff a letter providing him with notice of his termination, effective September 10, 2010.  (*See* Pl.'s Mot. Ex. 8).  The August 25 letter stated that Plaintiff was being terminated "for disciplinary reasons because [he had] been absent without [leave] (AWOL) since August 16, 2010."  (*Id.*).

## II.    LEGAL STANDARD

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  Summary judgment may be rendered on a "claim or defense . . . or [a] part of each claim or defense."  Fed. R. Civ. P. 56(a).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination.  An issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Holcomb*, 433 F.3d at 895 (quoting *Liberty Lobby*, 477 U.S. at 248) (citation omitted).  The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) ("We view the evidence in the light most favorable to the nonmoving party and draw all inferences in its favor.").  The non-movant's opposition, however, must consist of more than mere unsupported allegations or denials, and must be supported by affidavits, declarations or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The non-movant is "required to provide evidence that would permit a reasonable jury to find [in his favor]." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III.    DISCUSSION

### a.  Plaintiff's ADA and DCHRA Claims

The ADA prohibits discrimination in the workplace "against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  Similarly, the DCHRA makes it unlawful for an employer to discriminate against an individual "wholly or partially for a discriminatory reason based upon [an] actual or perceived . . . disability."  D.C. Code § 2-1402.11(a)(1).  In analyzing Plaintiff's DCHRA claims, the court will apply the standards applicable to claims brought under the ADA.  *See, e.g.*, *Badwal v. Bd. of Trustees of Univ. of D.C.*, No. 12-cv-2073 (KBJ), 2015 WL 5692842, at *6 (D.D.C. Sept. 28, 2015) ("Employment discrimination claims under the DCHRA are analyzed using the same legal framework as federal employment discrimination claims. Therefore the Court may consider both of plaintiff's disability discrimination claims under the ADA standard.") (citations omitted).

### i.    Plaintiff's Failure To Accommodate Claims

To prevail on his failure to accommodate claims, Plaintiff must prove, by a preponderance of the evidence, that (i) he was a qualified individual with a disability; (ii) OIG had notice of his disability; and (iii) OIG denied his request for a reasonable accommodation. *See Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014) (citing *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1307-08 (D.C. Cir. 2010); *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993)).

The second element is undisputed here:  The certification provided OIG with notice of Plaintiff's serious health condition.  While the District asserts that Plaintiff has not satisfied the first element because he "claims that he could not perform the essential functions of his job with or without an accommodation" (Def.'s Mot. at 5), the court need not address this argument because it finds that the third element is clearly lacking.  To wit, no reasonable jury could find

that OIG denied Plaintiff's accommodation request given that OIG responded to the request by offering accommodations that closely tracked the certification, and Plaintiff never responded to that offer.

"Few disabilities are amenable to one-size-fits-all accommodations.  To meet its obligations under the [ADA], then, an employer needs information about the nature of the individual's disability and the desired accommodation – information typically possessed only by the individual or her physician."  *Ward*, 762 F.3d at 31.  "When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation."  *Stewart*, 589 F.3d at 1309 (quoting 29 C.F.R. pt. 1630 app. § 1630.9).  EEOC regulations therefore provide as follows:

> To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation.  This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3); *see also Mogenhan v. Napolitano*, 613 F.3d 1162, 1167 & n.4 (D.C. Cir. 2010).

"The process contemplated is 'a flexible give-and-take' between employer and employee 'so that together they can determine what accommodation would enable the employee to continue working.'"  *Ward*, 762 F.3d at 32 (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)); *see also Mogenhan*, 613 F.3d at 1167-68 & n.4; *Stewart*, 589 F.3d at 1308-09.  "[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability."  *Ward*, 762 F.3d at 32 (quoting *Sears*, 417 F.3d at 805).  The D.C. Circuit has explained that in analyzing a failure to accommodate claim,

> courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.   A party that obstructs or delays the interactive process is not acting in good faith.   A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.   In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Id.* (quoting *Sears*, 417 F.3d at 805).

In sum, to establish that his request for an accommodation was "denied," Plaintiff must show that OIG either refused to engage in the interactive process, participated in the interactive process in bad faith, or ended the interactive process.   *See id.*   The operative facts, as asserted by the parties, are as follows:

- The last day Plaintiff reported to work at OIG was July 21, 2010.  (Pl.'s Opp'n at 2).

- On July 30, 2010, Plaintiff apprised OIG that he was "under [a] doctor's care, preventing [him] from returning to work," and "would be unable to report to work for another 4 to 6 weeks."  (Pl.'s Mot. Ex. 5 at 1).

- On August 6, 2010, OIG requested a medical certification to support Plaintiff's leave request.  (*See id.*).

- On August 13, 2010, Plaintiff provided OIG with the requested certification.  (*See* Pl.'s Mot. Ex. 6 at 1).

- On August 16, 2010, OIG sent Plaintiff a letter denying his specific leave request and proposing a set of accommodations that closely tracked the certification.  (*See id.*).

- Plaintiff never responded.

Given this timeline, and given the fact that the August 16 letter bore the hallmarks of good faith insofar as it offered accommodations that closely tracked the certification, it is clear that the interactive process broke down when Plaintiff failed to respond to the letter.

As an initial matter, Plaintiff is incorrect in asserting that OIG "completely ignored the fact that [his] physician indicated that it was necessary for [him] to be absent from work for the treatments he was receiving."  (Pl.'s Opp'n at 15).  First, the certification does not support

Plaintiff's contention that he was unable to report to work at all due to his treatment for his back issues. (*See* Pl.'s Mot. Ex. 5 at 1). Rather, the certification states that Plaintiff would be required "to take work only **intermittently or to work on a less than full schedule**" for approximately three months "because of **treatment** on an **intermittent** or **part-time** basis," with such treatment taking place three times per week for four to six weeks, and then one to two times per week for one month thereafter. (Pl.'s Mot. Ex. 4 at 1-2) (emphasis in original). Second, based on the certification, OIG proposed an accommodation whereby Plaintiff could take time off to attend treatment sessions and charge his "treatment and related commute . . . to eligible annual leave, sick leave, or leave without pay." (Pl.'s Mot. Ex. 6 at 1). While it was not the long-term continuous leave that Plaintiff had sought, OIG's proposed accommodation plainly took into consideration the fact Plaintiff needed to be absent from work on an intermittent basis in order to receive treatment.

Plaintiff also asserts that OIG "cherry-picked a remedy and sought to impose a unilateral demand that [he] return to work," and that this demand "was completely at odds with . . . Dr. Huynh's conclusion that [he] needed to avoid prolonged sitting, a requisite for [his] sedentary office position." (Pl.'s Opp'n at 15) (quotation and citations omitted). OIG's proposed accommodations were not "at odds" with the certification, however. As noted above, the certification did not state that Plaintiff needed to take weeks of continuous leave for treatment – it stated that he needed "to take work only **intermittently or to work on a less than full schedule**" for approximately three months "because of **treatment** on an **intermittent** or **part-time** basis." (Pl.'s Mot. Ex. 4 at 1-2) (emphasis in original). OIG's offer to allow Plaintiff to charge his "treatment and related commute . . . to eligible annual leave, sick leave, or leave without pay" was thus in keeping with the certification, not "at odds" with it. (Pl.'s Mot. Ex. 6

at 1).  Furthermore, the certification did not list any "**essential [job] functions**" that Plaintiff

would be **"unable to perform"** while undergoing treatment.  (Pl.'s Mot. Ex. 4 at 2) (emphasis in

original).  While the certification forbade "prolonged sitting" and lifting objects weighing more

than five pounds (*id.*), OIG offered two accommodations that directly addressed these

restrictions: (i) that Plaintiff "should stand up, stretch, and walk around to avoid prolonged

sitting"; and (ii) that Plaintiff should not be "required to lift items greater than five (5) pounds."

(Pl.'s Mot. Ex. 6 at 1).

 Moreover, Plaintiff's contention that OIG "impose[d] a unilateral demand" reveals a

fundamental misunderstanding of the interactive process outlined above.  (Pl.'s Opp'n at 15).

OIG's counteroffer of specific accommodations closely tracking the certification did not end the

interactive process; it merely put the ball in Plaintiff's court.  If Plaintiff believed that the

accommodations proposed by OIG were insufficient – perhaps because he needed additional

time off to recuperate in between his thrice-weekly treatment sessions, or perhaps because

standing up, stretching and walking around would not sufficiently alleviate the pain caused by

sitting at his desk to work – then he could have stated as much in a response to the August 16

letter.  Instead, Plaintiff essentially walked away from the interactive process, despite having

been warned that he would be listed as AWOL if he did not return to work.  Under these

circumstances, Plaintiff's failure to engage with OIG beyond his initial accommodation demand

and the provision of the certification dooms his failure to accommodate claims.  *See Ward*, 762

F.3d at 32 (holding that, in order to establish that a request for accommodation was denied, a

plaintiff must show that his or her employer "in fact ended the interactive process or that it

participated in the process in bad faith," and directing courts to "attempt to isolate the cause of

the breakdown and then assign responsibility").

The cases cited by Plaintiff in support of his failure to accommodate claims are all inapposite to the facts here.  For example, in *Norden v. Samper*, 503 F. Supp. 2d 130, 155-56 (D.D.C. 2007), the employer offered an "ersatz version of the accommodations suggested by [the plaintiff's] physicians," including "a sham proposal (a 'flexible' schedule that was actually inflexible)," and "simply ignored" two other requests.  Similarly, in *Graffius v. Shinseki*, 672 F. Supp. 2d 119, 129 (D.D.C. 2009), the plaintiff asked to be "provided an office on the same floor with a handicapped-accessible restroom," and her employer essentially ignored her request, simply stating that "the building [met] all applicable handicapped-accessible requirements," a fact that was entirely beside the point.  Unlike those cases, OIG's proposed accommodations directly addressed Plaintiff's needs as they were set forth in the certification.

Also inapposite is *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139 (9th Cir. 2001), in which the employer rejected the plaintiff's work-at-home request and failed to explore the possibility of other accommodations after it became aware that an initial accommodation arrangement was not effective.  The Ninth Circuit held that "the duty to accommodate is a continuing duty that is not exhausted by one effort," and that an employer's "obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues . . . where the employer is aware that the initial accommodation is failing and further accommodation is needed."  *Humphrey*, 239 F.3d at 1138 (quotation omitted).  Here, however, OIG offered accommodations that appeared responsive to the restrictions set forth in the certification, and received no response from Plaintiff.  Plaintiff proffers no evidence indicating that OIG should have been aware that its proposed accommodations would fail or that further accommodations would be needed.  Moreover, Plaintiff cites no case law indicating that OIG

was required to either propose different, additional accommodations or capitulate to Plaintiff's specific request in response to Plaintiff's silence after receiving the August 16 letter.[3]

In actuality, this case is similar to *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130 (7th Cir. 1996), which was discussed approvingly by the D.C. Circuit in both *Ward* and *Stewart*. In *Beck*, the plaintiff was a secretary who suffered from arthritis, depression and anxiety. *Id.* at 1132. Upon returning from medical leave, she provided her employer with a doctor's letter stating that an adjustable keyboard "would be helpful in preventing further difficulties with her hands," and that a reduced workload "would do much to assist in her transition back to work, and future productivity." *Id.* at 1133. The employer then sought more information from plaintiff, but received none. *See id.* The employer also took steps to accommodate the plaintiff based on the information in the doctor's letter, but was unable to do so to her satisfaction. *See id.* The Seventh Circuit affirmed the district court's grant of summary judgment to the employer because it did not attempt "to sweep the problem under the rug" and instead took "numerous steps to accommodate [plaintiff] based on information available to it." *Id.* at 1136. Similarly, in this case, OIG responded to Plaintiff's request by proposing accommodations that closely tracked the certification, and there is no evidence that OIG attempted "to sweep the problem under the rug." OIG was not required to do more than what it did in the face of Plaintiff's silence.

Simply put, the evidence in this case indicates that Plaintiff and OIG parted ways not because OIG failed to accommodate his disability, but because he acted precipitately in failing to respond to OIG's proposed accommodations and essentially walking away from the interactive

---

[3] *McNair v. D.C.*, 11 F. Supp. 3d 10 (D.D.C. 2014), is also inapposite. In that case, the court found that "a jury could conclude that [the employer] was responsible for the breakdown in communication." 11. F. Supp. 3d at 17. Here, for the reasons set forth above, it is clear that Plaintiff was responsible for the breakdown in communication, not OIG.

process, and his job.  The court therefore finds that the District is entitled to summary judgment on Plaintiff's failure to accommodate claims under the ADA and DCHRA, and hereby **GRANTS** the District's Motion with regard to Counts I and III of the Complaint.

### ii.    Plaintiff's Disability Discrimination Claims

"Putting aside the issue of reasonable accommodation, the two basic elements of a disability discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's disability."  *Adeyemi v. D.C.*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). Here, it is undisputed that Plaintiff's termination constituted an adverse employment action.  The question that remains to be decided is whether he was terminated because of his disability.

Where there is no direct evidence of disability discrimination, as is the case here, courts in this Circuit apply the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence.  *See Kersey v. Wash. Metro. Area Transit Auth.*, 586 F.3d 13, 17 (D.C. Cir. 2009).  The defendant then has the burden to rebut that *prima facie* case with evidence of a legitimate, non-discriminatory reason for its actions.  *See id.* (quotation omitted).  Finally, if the defendant has produced such evidence, the plaintiff must show by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, and were instead a pretext for discrimination.  *See id.* (quotation omitted).

"This three-step process differs slightly at the summary-judgment stage," however. *Joyce v. Office of Architect of Capitol*, 106 F. Supp. 3d 163, 169 (D.D.C. 2015).  "At this point in the proceedings, if the defendant can offer a legitimate reason for the challenged action, then district courts may skip over the first step of the analysis, since in such circumstances 'the *prima*

*facie* case is a largely unnecessary sideshow.'" *Id.* (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).

In the instant action, the court finds that the District has proffered a legitimate, non-discriminatory reason for terminating Plaintiff:  His absenteeism, including his absence without leave from August 16, 2010 onward.  *See Gurara v. D.C.*, 881 F. Supp. 2d 143, 148 (D.D.C. 2012) ("Absenteeism is, without doubt, a legitimate, non-retaliatory reason for taking action against an employee.") (citing *McGill v. Munoz*, 203 F.3d 843, 846 (D.C. Cir. 2000); *Short v. Chertoff*, 555 F. Supp. 2d 166, 176-77 (D.D.C. 2008)).

The undisputed evidence establishes that Plaintiff was informed on August 13, 2010 – over three weeks after he had last reported to work – that (i) OIG did not read the certification as requiring weeks of continuous leave; (ii) OIG had proposed alternative accommodations, including intermittent leave to attend treatment; (iii) he was expected to report to work immediately; and (iv) he would be listed as AWOL if he did not do so.  (*See* Pl.'s Mot. Ex. 6 at 1-2).  Despite these warnings, Plaintiff did not respond to the August 16 letter or otherwise follow up with OIG in any way (including, for example, by providing an updated medical certification), and did not show up to work.  Under these circumstances, with Plaintiff simply going AWOL without providing any additional support for his request for weeks of continuous leave, OIG was within its rights to terminate him.  *See*, *e.g.*, *Stoops v. One Call Commc'ns, Inc.*, 141 F.3d 309, 313 (7th Cir. 1998) (noting that the employee is "the person most able to determine that [an] initial certification was 'wrong' and [i]s the person with the incentive, and certainly the burden, to have it corrected").[4]

---

[4] Plaintiff asserts that he "had sought further clarification from his physician and was preparing to provide another certification from Dr. Huynh, but was terminated four (4) days before he had a chance to provide this supplemental information."  (Pl.'s Opp'n at 16).  He also submits a copy

Because Plaintiff's absenteeism provided OIG with a legitimate, non-discriminatory reason for terminating him, the court must determine whether Plaintiff has "produced sufficient evidence for a reasonable jury to find that [OIG's] asserted non-discriminatory reason was not the actual reason and that [OIG] intentionally discriminated against [him] on a prohibited basis." *Adeyemi*, 525 F.3d at 1226 (*citing Brady*, 520 F.3d at 493-95). The court finds that he has not.

Plaintiff argues that the District used his absenteeism as a pretext for terminating him because (i) he "had a positive annual leave balance at the time of his termination"; (ii) his "leave usage from January 1, 2010 until his termination was not excessive"; and (iii) he "had only been AWOL for approximately a week when he was terminated." (Pl.'s Opp'n at 18) (citations omitted). But while Plaintiff had a positive leave balance and had not previously been excessive in taking leave, he was terminated for being absent *without leave*, having opted *against* taking OIG up on its offer to allow him to charge any intermittent treatment-related absences to eligible annual leave, sick leave, or leave without pay while otherwise continuing to report to work, which would have allowed him to take advantage of his positive leave balance. As for the fact that Plaintiff "had only been AWOL" from August 16, 2010 through August 25, 2010, Plaintiff

---

of this supplemental certification. (*See* Pl.'s Mot. Ex. 10). But Plaintiff never informed OIG that he was in the process of gathering more information regarding his condition, and never provided any supplemental certification to OIG. OIG was therefore entitled to rely on the original certification.

Moreover, it is not clear to the court whether the supplemental certification is dated August 19, 2010 or, as Plaintiff claims, August 29, 2010. (*See* Pl.'s Mot. Ex. 10 at 3). Even assuming that the supplemental certification is dated August 29, 2010 (meaning that it was, in fact, completed four days after Plaintiff received the termination letter), Plaintiff's termination was not effective until September 10, 2010. (*See* Pl.'s Mot. Ex. 8). Plaintiff therefore had, at a minimum, twelve days to provide the supplemental certification to OIG prior to the effective date of his termination, yet he failed to do so.

cites no case law or evidence indicating that there is anything pretextual about terminating an employee who has been AWOL for over a week.  (Pl.'s Opp'n at 18).

In sum, the District has proffered a legitimate, non-discriminatory reason for terminating Plaintiff, and Plaintiff has not produced evidence that would permit a reasonable jury to find that the District's asserted reason was a mere pretext for prohibited discrimination.  The court therefore finds that the District is entitled to summary judgment on Plaintiff's disability discrimination claims under the ADA and DCHRA, and hereby **GRANTS** the District's Motion with regard to Counts II and IV.

### b.  Plaintiff's FMLA Claim

Plaintiff also alleges that the District interfered with the exercise of his rights under the FMLA.  The FMLA provides eligible employees with twelve weeks of unpaid leave during any twelve-month period if a "serious health condition" prevents such an employee from performing the functions of his or her job.  29 U.S.C. § 2612(a)(1)(D).  The statute also prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided" thereunder.  *See id.* § 2615(a)(1).

The District points out, correctly, that FMLA leave may be denied absent an appropriate certification.  It is similarly axiomatic that FMLA leave may be denied if a medical certification does not support an employee's entitlement to such leave.  In the instant case, however, while the certification does not support Plaintiff's request for several weeks of continuous leave for all the reasons discussed above, it *does* demonstrate his entitlement to periodic or intermittent FMLA leave, as it shows that he would have been unable to perform the functions of his job during intermittent treatment-related absences.  *See* 29 U.S.C. § 2612(a)(1)(D), (b)(1) (leave for "a serious health condition that makes the employee unable to perform the functions of the position

of such employee . . . may be taken intermittently or on a reduced leave schedule when medically necessary").

Throughout its briefing, the District conflates its assertion that the certification does not support Plaintiff's request for continuous leave (which is correct) with the assertion that the certification does not support FMLA leave (which is incorrect). For example, the District cites a number of so-called "negative certification" cases. (*See*, *e.g.*, Def.'s Mot. at 10; Def.'s Opp'n & Reply at 4-5). "[T]he 'negative certification' principle has been applied when [a] medical certification affirmatively states that despite the employee's recognized medical condition, the employee is not required to miss any work due to the condition." *Fritz v. Phillips Serv. Indus., Inc.*, 555 F. Supp. 2d 820, 824 (E.D. Mich. 2008) (citing *Nawrocki v. United Methodist Ret. Communities, Inc.*, 174 F. App'x 334, 338 (6th Cir. 2006); *Stoops*, 141 F.3d at 311). In *Nawrocki*, for example, the plaintiff's health care provider submitted a medical certification indicating that the plaintiff's serious health condition did not require a reduced work schedule or intermittent leave. 174 F. App'x at 338. The Sixth Circuit held that this "negative certification" failed to place the employer on notice that the employee qualified for FMLA leave and justified the employer in denying FMLA leave and subsequently terminating the employee for excessive absences. *Id.* at 337-38.

The cases cited by the District are all similar to *Nawrocki*. In *Allen v. Progress Energy Inc.*, No. 07-cv-1588-Orl-19 (GJK), 2009 WL 425966, at *8 (M.D. Fla. Feb. 20, 2009), "the undisputed evidence establishe[d] that [the plaintiff] was not entitled to FMLA leave." In *Stoops*, the plaintiff's medical documentation stated that his medical condition "did not require him to miss work," leading the Seventh Circuit to find that the plaintiff did not give his employer notice of a "qualifying reason" for FMLA leave. 141 F.3d at 313-14 ("Where an employer

properly requests a physician's certification under the FMLA and that certification indicates the

employee is not entitled to FMLA leave, the employer does not violate the FMLA by relying

upon that certification in the absence of some overriding medical evidence.").  In *Tayag v. Lahey

Clinic Hosp., Inc.*, 632 F.3d 788, 793 (1st Cir. 2011), the First Circuit held that the employer

"was justified in denying FMLA leave" in part because the employee's "cardiologist had

disavowed the need for any leave."  In *Brady v. Potter*, 476 F. Supp. 2d 745, 757-58 (N.D. Ohio

2007), the court held that the employer was permitted to rely on a "negative certification" in

denying FMLA leave because the certification "did not indicate a serious health condition that

rendered her unable to perform her job functions."

   Unlike the cases cited above, this case does not involve a "negative certification."  While

the certification indicates that Plaintiff was not entitled to the weeks of continuous FMLA leave

that he requested, it clearly indicates that he was entitled to intermittent FMLA leave because he

would have been unable to perform the essential functions of his position during periodic

absences for required treatment.[5]

   The District argues that Plaintiff cannot establish that he was "unable to perform the

functions" of his position because nothing in the certification indicated that he needed to be

completely absent from work to complete treatment.  29 U.S.C. § 2612(a)(1)(D).  The

certification clearly states, however, that Plaintiff would need "to take work only **intermittently

or to work on a less than full schedule**" for approximately three months, during which time he

would need "to be **absent from work . . . [for] treatment** on an **intermittent** or **part-time**

basis."  (Pl.'s Mot. Ex. 4 at 1-2) (emphasis in original).

---

[5] The District's citation to cases involving "absence[s] for unnecessary treatment or no treatment
at all" and "calling in 'sick' without providing more information" are inapposite for this reason,
as well.  (Def.'s Mot. at 9-10) (quotation and citations omitted).

Because "[a]n employee who must be absent from work to receive medical treatment for a serious health condition is considered to be unable to perform the essential functions of the position during the absence for treatment," 29 C.F.R. § 825.123(a), the certification makes clear that Plaintiff would have been unable to perform the essential functions of his position during the intermittent absences for which it calls. The certification therefore demonstrates that Plaintiff's medical condition was a "qualifying reason" for FMLA leave. *Cf. Suchanek v. Univ. of Kentucky*, No. 10-cv-0019(DCR), 2011 WL 3045986, at *6 (E.D.Ky. July 25, 2011) ("Suchanek completed her treatments over her lunch hour and, therefore, did not miss work to complete them. Her actions prove that the treatments did not render her 'unable to perform the functions of the position.' In other words, Suchanek's ability to complete the treatments without missing work indicates that they were not FMLA-qualifying in the first place.") (quoting 29 U.S.C. § 2612(a)(1)(D)).

The fact that the certification provided OIG with notice of a qualifying reason for FMLA leave has important repercussions, as it triggered several FMLA notice regulations. Specifically, when an employer "acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave." 29 C.F.R. § 825.300(b)(1). The employer must also "provide written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." *Id.* § 825.300(c)(1). Additionally, when an employer "has enough information to determine whether the leave is being taken for an FMLA-qualifying reason (e.g., after receiving a certification), the employer must notify the employee whether the leave will be designated and will be counted as FMLA leave." *Id.* § 825.300(d)(1). Failure to abide by these notice requirements "may constitute an interference

with, restraint, or denial of the exercise of an employee's FMLA rights," and an employer "may

be liable for compensation and benefits lost by reason of the violation, for other actual monetary

losses sustained as a direct result of the violation, and for appropriate equitable or other relief,

including employment, reinstatement, promotion, or any other relief tailored to the harm

suffered." *Id.* § 825.300(e).

Here, despite the fact that Plaintiff's certification provided OIG with a qualifying reason

for intermittent FMLA leave, OIG did not (i) notify Plaintiff of his eligibility to take FMLA

leave as required by section 825.300(b)(1); (ii) provide Plaintiff with written notice detailing his

specific expectations and obligations and explaining any consequences of a failure to meet these

obligations as required by section 825.300(c)(1); or (iii) notify Plaintiff whether the leave would

be designated and counted as FMLA leave as required by section 825.300(d)(1). Instead, OIG

simply denied Plaintiff's request for leave and stated that he could charge the intermittent

absences called for by the certification "to eligible annual leave, sick leave, or leave without

pay." (Pl.'s Mot. Ex. 6 at 1). While OIG was entitled to deny Plaintiff's request for continuous

leave because it did not correspond to the requirements set out in the certification, it was required

to notify Plaintiff of his eligibility for intermittent FMLA leave and to follow the other

applicable notice requirements set forth in section 825.300.

The FMLA affords relief only for actual damages, however. Prejudice to the employee is

a necessary element because "the statutory cause of action for FMLA violations, provides only

for compensatory – and not punitive – damages." *Roseboro v. Billington*, 606 F. Supp. 2d 104,

108 (D.D.C. 2009) (citation and footnote omitted). Thus, "[a]n FMLA violation prejudices an

employee only when the 'employee loses compensation or benefits by reason of the violation,

sustains other monetary losses as a direct result of the violation, or suffers some loss in

employment status remediable through appropriate equitable relief.'"  *Id.* (quoting *Reed v.*

*Buckeye Fire Equip.*, 241 F. App'x 917, 924 (4th Cir. 2007)) (citations omitted).

 The District asserts that Plaintiff fails to meet the prejudice element because the record

does not show that OIG's failure to provide notice caused his termination.  Plaintiff contends,

however, that the mere fact of his termination is sufficient to show the requisite harm because the

failure to provide notice caused him to be placed on AWOL status rather than be granted FMLA

leave, which, in turn, led to his termination.

 While Plaintiff has proffered evidence that he suffered prejudice as a result of his

termination, there remains a genuine issue of material fact as to whether OIG's failure to provide

Plaintiff with the forms of notice required by section 825.300 actually caused his termination.

As noted above, Plaintiff requested continuous leave despite the fact that the certification

indicated that he needed only intermittent leave.  There is a factual dispute with regard to

prejudice because the evidence before the court does not demonstrate that Plaintiff *would have*

*actually accepted* the intermittent FMLA leave to which he was entitled had he received the

requisite FMLA notice.

 For example, Plaintiff did not show up to work, or otherwise reach out to OIG in any

way, after being informed that his intermittent absences for treatment could be "charged to

eligible annual leave, sick leave, or leave without pay" – all of which are functionally similar to

the kind of intermittent leave to which Plaintiff was entitled under the FMLA.  (Pl.'s Mot. Ex. 6

at 1).  A reasonable jury could conceivably find that, even if he had been informed of his

eligibility for intermittent FMLA leave, Plaintiff would have taken the same "all or nothing"

approach and ignored any offer by OIG to charge his intermittent absences to FMLA leave.

Likewise, a reasonable jury could conceivably find that, had he been provided with the requisite FMLA notice, Plaintiff would have either accepted intermittent FMLA leave or provided a new medical certification demonstrating his purported need for continuous leave. For example, while Plaintiff did not provide OIG with any additional medical information beyond the certification, a reasonable jury could find that he would have provided supplemental information had he been informed of his FMLA eligibility and/or granted intermittent FMLA leave, particularly given that applicable regulations provide a process for the resolution of disputes over FMLA leave designations (*see* 29 C.F.R. § 825.301(c)), permit employers to "retroactively designate leave as FMLA leave" (*id.* § 825.301(d)), and provide for the clarification of FMLA medical certifications, where necessary (*see id.* § 825.307).

The court therefore concludes that, while OIG may have been justified in rejecting Plaintiff's request for continuous FMLA leave, it was nevertheless required to provide Plaintiff with the forms of notice required by 29 C.F.R. § 825.300 because the certification established that he was entitled to intermittent FMLA leave. Because there exists a genuine issue of material fact as to whether Plaintiff suffered any harm as a result of OIG's failure to provide the requisite notice, the court finds that neither party is entitled to summary judgment on Plaintiff's FMLA claim, and **DENIES** both the District's Motion and Plaintiff's Motion with regard to Count V of the Complaint.

## IV.   CONCLUSION

For the reasons set forth above, the District of Columbia's Motion for Summary Judgment is hereby **GRANTED IN PART and DENIED IN PART**, and Plaintiff Ronald Hodges' Motion for Summary Judgment is hereby **DENIED**.

An appropriate Order accompanies this Memorandum Opinion.

Date:  March 28, 2016

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge